**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| HENRY A. et al., | ) | |
| Plaintiffs, | ) | |
| | ) | 2:10-cv-00528-RCJ-PAL |
| vs. | ) | |
| | ) | |
| MICHAEL WILLDEN et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

This case arises out of the alleged failure of Nevada and Clark County officials to adequately protect foster children. Pending before the Court are the State Defendants' Motion to Dismiss (ECF No. 107) and the County Defendants' Motion to Dismiss (ECF No. 108). For the reasons given herein, the Court grants the motions in part and denies them in part.

**I.      FACTS AND PROCEDURAL HISTORY**

Plaintiffs are twelve anonymous children who claim to have been harmed due to the failure of state and county child welfare authorities to adhere to certain mandatory laws and regulations and to ensure their safety as a general matter. Their injuries include abuse and neglect by foster parents and institutional guardians, as well as a lack of medical care due to authorities' refusal to authorize or monitor it.

Plaintiff Henry A. is a fourteen-year-old boy who has been placed into foster care by the Clark County Department of Family Services ("CCDFS") and the Nevada Division of Children

1    and Family Services ("NDCFS") since age four. (Am. Compl. ¶ 20, July 20, 2012, ECF No. 104).

2    He suffers from severe mental health problems but his treatment has been sporadic because of his

3    placement with over forty foster families and six or seven caseworkers during his first seven

4    years under CCDFS. (*See id.*).  He has changed mental health providers over ten times. (*Id.*).  He

5    has been prescribed multiple psychotropic drugs and once overdosed because of a combination of

6    these drugs, spending several weeks in the intensive care unit. (*Id.*).

7        Plaintiffs Charles B. and Charlotte B. are siblings, ages eleven and three, respectively.

8    (*Id.* ¶ 21).  They were placed into seventeen different placements for foster care by CCDFS from

9    March 2009 to the Fall of 2010, when they were returned to their mother's care. (*Id.*).  CCDFS

10   placed Charles and Charlotte with foster parents in March 2009 despite a court order requiring

11   placement with their grandmother. (*Id.*).  Their foster mother and her teenage son abused them,

12   including locking Charlotte in a closet with no food, water, or sanitation for long periods of time

13   and beating Charles when he tried to help his sister. (*Id.*).  The police eventually removed them

14   and took them to the hospital for treatment. (*Id.*).  Charlotte was suffering from dehydration, cuts,

15   bruises, and severe (bleeding) diaper rash. (*Id.*).  The foster mother has been charged with child

16   abuse, and her son has pled guilty to assault. (*Id.*).

17       Plaintiff Linda E. is a nineteen-year-old woman who was placed into more than forty

18   different placements for foster care by CCDFS and NDCFS for over fifteen years. (*Id.* ¶ 22).  She

19   suffered abuse and neglect in many of these placements, including being placed into the home of

20   an aunt where she had previously suffered unspecified abuse. (*Id.*).  Linda reported the abuse to

21   her caseworker. (*Id.*).  She did not receive proper medical and psychiatric care. (*Id.*).

22       Plaintiffs Leo and Victor C. are nineteen-year-old twins who were placed into foster care

23   by CCDFS in November 2006. (*Id.* ¶ 23).  Leo left the system when he became an adult in

24   December 2010. (*Id.*).  Victor, however, chose to remain in the system after age eighteen and

25   now receives benefits under Assembly Bill 350. (*Id.*).  Defendants refused to place Leo and

1   Victor in the care of their grandmother, who was ready, willing, and able to provide a safe and

2   appropriate environment for them, instead moving them between their father and their mother

3   and her boyfriend, where they suffered unspecified abuse. (*Id.*).  Eventually, either their mother

4   or father abandoned them at Child Haven. (*See id.*).  Defendants failed to provide psychiatric care

5   despite Victor's suicidal threats. (*Id.*).  Plaintiffs do not allege any untreated psychiatric

6   conditions of Leo.

7           Plaintiffs Delia, Maizy, and Jonathan D. are siblings. (*Id.* ¶ 24).  Delia is four years old

8   and was placed into foster care by CCDFS from March 2008 to October 2010. (*Id.*).  Maizy and

9   Jonathan are ages seven and six, respectively, and were placed into foster care by CCDFS from

10  late 2005 to August 2009. (*Id.*).  As infants, Defendants placed them with Child Haven, where

11  they did not receive basic nutrition and medical care. (*Id.*).  They were kept on a "formula diet"

12  despite outgrowing it. (*Id.*).  Maizy and Jonathan were left in their cribs with limited interaction

13  with other children and adults, resulting in a diagnosis (presumably by a doctor, though not

14  explicitly so alleged) with "failure to thrive," based upon being underweight due to

15  environmental factors. (*See id.*).  S.W. has adopted all three children. (*Id.*).  Defendants have

16  failed to provide authorization for at least three medical procedures for the children despite

17  S.W.'s efforts. (*Id.* ¶ 25).  The related conditions became so severe that doctors proceeded with

18  the procedures on an emergency basis. (*Id.*).  As a result, Jonathan has a misshapen colon that

19  must be surgically corrected due to Defendants' failure to authorize removal of calcified stool

20  from his colon, and Delia had to undergo emergency surgery to remove a tumor behind her eye.

21  (*Id.*).

22          Plaintiff Olivia G. is an eleven-year-old girl who was placed into foster care by CCDFS

23  from January 2006 to 2011. (*Id.* ¶ 26).  Defendants failed to remove her from the custody of her

24  parents despite reports that she was being abused. (*Id.*).  She was initially placed with various

25  relatives without any effort to determine if they were able to provide appropriate care. (*Id.*).  She

1   was abused in some of those homes, including being beaten with a belt. (*Id.*). She has severely

2   impaired neuropsychological functioning and several cognitive and behavioral impairments as a

3   result. (*Id.*). She was also prescribed multiple psychotropic drugs without adequate care and

4   monitoring, including being placed with E.F. without providing E.F. the information and

5   authorizations required to obtain Olivia's prescriptions. (*Id.*).

6       Plaintiff Christine F. is a five-year-old girl who was placed into foster care by CCDFS

7   from May 2008 to June 2010, when E.F. adopted her. (*Id.* ¶ 27). Christine is severely

8   developmentally delayed and suffers form permanent disabilities and a seizure disorder due to

9   having fallen from a second-story window at the home of her mother, grandmother, and two

10  uncles. (*See id.*). Despite marks around her ankles indicating she had been dangled from the

11  window or been swung into a wall, CCDFS did not investigate and take custody of Christine

12  until her parents refused to authorize medical treatment necessary to treat her injuries. (*Id.*).

13  Defendants later failed to provide E.F. with Christine's seizure medications and offered no

14  medical support or training on how to care for her special needs. (*Id.*). Defendants have also

15  permitted her grandmother to visit her despite knowing of past allegations of abuse against her

16  and that she was watching over Christine when she fell from the window. (*Id.*).[1]

17      Plaintiff Mason I. is a fourteen-year-old boy who has been placed into foster care by

18  CCDFS since July 2003. (*Id.* ¶ 28). Mason has been deaf since birth and entered foster care at

19  age six after suffering physical, sexual, and emotional abuse by his parents and grandparents.

20  (*Id.*). He suffers from post-traumatic stress disorder, reactive attachment disorder, and other

21  serious mental health problems. (*Id.*). During his first six years in foster care, he was placed into

22  twenty-five different homes, including a treatment center in Florida, the National Deaf Academy

23  ("NDA"). (*Id.*). The NDA staff rendered Mason's cochlear implant permanently inoperative

24  _____

25      [1]Plaintiff does not allege actual abuse by this person against Christine herself or any other person, but notes only that CCDFS was aware of prior allegations of abuse.

1    against his wishes. (*Id.*).  Defendants ignored Mason's complaints of sexual abuse by NDA staff.

2    (*Id.*).  Defendants have failed to place Mason into homes where his special needs will be met,

3    i.e., with a qualified American Sign Language interpreter and have failed to provide speech

4    therapy. (*Id.*).  Defendants have failed to disclose Mason's medical, mental, social, and

5    educational backgrounds to his foster parents and have failed to properly supervise the

6    administration of Mason's psychotropic drugs. (*Id.*).

7         Plaintiffs sued two groups of Defendants.  The State Defendants are Michael Willden,

8    Director of the Nevada Department of Health and Human Services ("NDHHS"), sued in his

9    official and individual capacities; Diane Comeaux, the Administrator of NDCFS from June 2008

10   to December 2011, sued in her individual capacity; and Amber Howell, the current Administrator

11   of NDCFS, sued in her official capacity.  The County Defendants are Clark County; Virginia

12   Valentine, the Clark County Manager from August 2006 to January 2011, sued in her individual

13   capacity; Don Burnette, the current Clark County Manager, sued in his official capacity; Tom

14   Morton, the Director of CCDFS from July 2006 to August 2011, sued in his individual capacity;

15   and Lisa Ruiz-Lee, the current Director of CCDFS, sued in her official capacity.  Plaintiffs filed

16   the seventy-five-page Complaint in this Court on April 13, 2010, listing the following twelve

17   nominal claims: (1)–(2), (11) substantive due process violations pursuant to 42 U.S.C. § 1983;

18   (3), (8) violations of the Adoption Assistance and Child Welfare Act ("AACWA") pursuant to

19   § 1983; (4), (12) substantive due process violations under the Nevada Constitution; (5)

20   negligence; (6) declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 that Nevada

21   Revised Statute ("NRS") section 424.090 violates the Supremacy Clause; (7) declaratory and

22   injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 that NRS section 432.0177 violates the

23   Supremacy Clause; and (9)–(10) violations of the Child Abuse Prevention and Treatment Act

24   ("CAPTA") pursuant to § 1983.  The case was assigned to the Hon. Howard D. McKibben but

25   was reassigned to this Court after Judge McKibben recused himself.

1        Defendants moved to dismiss. Plaintiffs voluntarily dismissed the sixth and seventh

2   nominal claims (the Supremacy Clause claims). In a thirty-one-page order, the Court granted the

3   motions to dismiss. (*See* Order, Oct. 26, 2010, ECF No. 85). The Court ruled: (1) Defendants in

4   their official capacities were not entitled to Eleventh Amendment protection from claims for

5   prospective injunctive relief; (2) Defendants were not entitled to absolute immunity; (3)

6   Defendants were entitled to qualified immunity from the "duty to protect" substantive due

7   process claim; (4) Defendants were entitled to qualified immunity from the "state created

8   danger" substantive due process claim, and the claim was also dismissed for failure to state a

9   claim; (5) sections 671(a)(10), (16) and 675(1), (5)(A)(ii), (5)(D) of the AACWA created no

10   private right of action, and Defendants were entitled to qualified immunity against these claims

11   in any case; (6) Defendants were entitled to qualified immunity from the "guardian ad litem"

12   CAPTA claim, and the Court would abstain from ruling on that claim under *Younger v. Harris*,

13   401 U.S. 37 (1971) due to pending state proceedings; (7) there was no private right of action for

14   a "plan submission" claim under CAPTA; and (8) the Court would decline to rule on the

15   negligence claim under 28 U.S.C. § 1367(c).

16        Plaintiffs appealed. In a thirty-four-page opinion, the Court of Appeals affirmed in part,

17   reversed in part, and remanded. The Court affirmed the dismissal of all claims except the first,

18   second, third, eighth, and eleventh, which claims it remanded for further proceedings, and ruled

19   that Plaintiffs should be permitted to amend the substantive due process claims after remand and

20   should be able to seek leave to amend the tenth claim. The Court of Appeals ruled that qualified

21   immunity applied only to Defendants in their individual capacities and only as to monetary

22   damages. It reversed the qualified immunity rulings as to injunctive relief and as to monetary

23   damages against Clark County as to the first and eleventh causes of action and remanded for

24   further analysis of qualified immunity as to the claims for monetary damages against Defendants

25   in their individual capacities. As to the second cause of action, the Court of Appeals ruled that

1    the "state created danger" doctrine applied not only when the state literally created the danger,

2    but also when the state knowingly exposed a person to an existing danger from a third person.

3    The Court of Appeals therefore reversed dismissal of the second claim and this Court's grant of

4    qualified immunity.  The Court of Appeals ruled that Plaintiffs had not sufficiently pled

5    supervisory responsibility claims against State Defendants but should be given leave to amend

6    the substantive due process claims to do so.  The Court of Appeals ruled that the "case plan"

7    provisions of AACWA under 42 U.S.C. §§ 671(a)(16) and 675(1) and the "records provision"

8    provisions of AACWA under §§ 671(a)(16), 675(1), and 675(5)(d) were privately enforceable.

9    The Court of Appeals affirmed that the "guardian ad litem" and "early intervention" provisions

10    of CAPTA, as well as the Individuals with Disabilities Education Act provision Plaintiffs

11    invoked, were not privately enforceable.

12         Plaintiffs filed the Amended Complaint ("AC"), listing seven nominal claims: (1)–(2)

13    substantive due process violations pursuant to § 1983; (3), (7) AACWA violations pursuant to

14    § 1983; (4) substantive due process violations under the Nevada Constitution; and (5) negligence.

15    State Defendants and County Defendants have separately moved to dismiss the AC.

16    **II.    LEGAL STANDARDS**

17         Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

18    claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

19    what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47

20    (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

21    that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule

22    12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720

23    F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for

24    failure to state a claim, dismissal is appropriate only when the complaint does not give the

25    defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is plausible, not just possible. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

///

///

///

1   **III.    ANALYSIS**

2       **A.    State Defendants' Motion to Dismiss**

3       **1.    Substantive Due Process**

4          The Court first notes that the substantive due process claim under the Nevada

5   Constitution is redundant with the parallel claim under the U.S. Constitution.  Nevada's Due

6   Process Clause is textually identical to the federal clause in relevant respects, *compare* Nev.

7   Const. art. 1, § 8(5), *with* U.S. Const. amend XIV, § 1, and the Nevada Supreme Court reads the

8   state clause as coextensive with the federal clause, *see, e.g., Wyman v. State*, 217 P.3d 572, 578

9   (Nev. 2009).  The Due Process Clause of the Fifth Amendment does not apply to the states,

10  *Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833) (Marshall, C.J.), and the Due Process

11  Clause of the Fourteenth Amendment, which does apply to the states, *see* U.S. Const. amend

12  XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process

13  of law"), was not adopted until 1868.  The Declaration of Rights that comprises Article I of the

14  Nevada Constitution, which was adopted in 1864, was therefore necessary in order to impose

15  certain restrictions upon the State of Nevada that were already imposed against the federal

16  government under the Bill of Rights, and the Nevada Supreme Court has not interpreted the

17  protections of the Declaration of Rights to exceed the scope of their federal counterparts. Michael

18  W. Bowers, The Sagebrush State 43–44 (3rd ed., Univ. Nev. Press 2006); Michael W. Bowers,

19  The Nevada State Constitution 24 (1993).  During the Nevada Constitutional Convention in

20  1864, Nevada's Due Process Clause was not debated, although several other provisions of the

21  Declaration of Rights—including Section 8, of which Nevada's Due Process Clause is a

22  subsection—were heavily debated. *See generally* Andrew J. Marsh, Official Report of the

23  Debates and Proceedings of the Constitutional Convention of the State of Nevada (Frank

24  Eastman pr., 1866), available at http://books.google.com.  The adoption of this parallel clause,

25  without any recorded debate, indicates that the intent of the framers of Nevada's Constitution

1   was to adopt the federal clause and all of its meanings.  That in itself does not necessitate the

2   Nevada Supreme Court's acceptance of the U.S. Supreme Court's interpretations of the federal

3   clause when it interprets the state clause, but the Nevada Supreme Court does not yet appear to

4   have interpreted the state clause differently.

5        The Court of Appeals noted that there are two exceptions to the general rule that a state

6   has no duty under the due process clause to protect persons from third persons: (1) the "special

7   relationship" exception, where a state assumes responsibility for the safety and well-being of a

8   person in its custody; and (2) the "state-created danger" exception, where a state affirmatively

9   places a person in danger with deliberate indifference to a known and obvious danger. *See Henry*

10  *A. v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012) (citing *Patel v. Kent Sch. Dist.*, 648 F.3d 965,

11  971–72 (9th Cir. 2011) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189,

12  198–202 (1989) (special relationship doctrine); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)

13  (state-created danger doctrine))).  The Court previously dismissed these claims against all

14  Defendants based upon qualified immunity.

15       The Court of Appeals reversed as to the "special relationship" substantive due process

16  claim because qualified immunity does not apply to Clark County or to any claims for injunctive

17  relief as a matter of law, and at the dismissal stage in the present case, the individual Defendants

18  were not entitled to qualified immunity against claims for money damages. *See id.* at 999–1001.

19  Plaintiffs had sufficiently made out a "special relationship claim" for which there was no

20  qualified immunity at the dismissal stage. *See id.*  The Court of Appeals also reversed the Court's

21  dismissal of the "state-created" danger claim and its grant of qualified immunity against that

22  claim, ruling that the claim could lie not only where the state had created the danger itself, but

23  also where it had exposed a person to a pre-existing danger from a third person. *See id.* at

24  1002–03.  The law of the case therefore prevents both dismissal for failure to state a claim and

25  qualified immunity as to either facet of the substantive due process claim, and the Court therefore

1    denies the present motion to dismiss in this regard.

2         The Court of Appeals agreed with the Court that Plaintiffs had not in the Complaint

3    sufficiently pled supervisory liability as to State Defendants but ruled that Plaintiffs should be

4    given leave to amend in this regard. *See id.* at 1003–05.  Plaintiffs had sufficiently alleged a

5    custodial relationship with State Defendants under the "special relationship" facet of the

6    substantive due process claim because even those who had not been in the direct custody of

7    NDCFS itself at some point had been in the custody of CCDFS, which NDCFS was responsible

8    for supervising. *See id.*  The Court of Appeals noted that a supervisor could only be liable under

9    § 1983 for his or her own personal involvement in a violation or "for his own culpable action or

10   inaction in the training, supervision, or control of his subordinates; for his acquiescence in the

11   constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

12   rights of others." *Id.* at 1004 (quoting *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011)

13   (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998))).  The Court of

14   Appeals noted that Plaintiffs had not sufficiently alleged supervisory responsibility of Willden or

15   Comeaux (those State Defendants sued in their individual capacities):

16        [T]here are few specific allegations against the State defendants.  Most of the
          allegations in the complaint simply reference "Defendants," without specifying
17        whether the conduct at issue was committed by the named State officials, County
          officials, or the "John Doe" supervisors or caseworkers.  For many of the detailed
18        factual allegations, such as the failure to respond to a particular report of abuse or
          authorize a particular medical procedure, it is implausible to suggest that Willden or
19        Comeaux personally committed the alleged violation.

20             . . . .

21             The allegations that do expressly reference the State defendants are too
          general to state a claim for supervisory liability.
22
               . . . .
23
          [T]he allegations here claim that the agencies directed by Willden and Comeaux have
24        oversight responsibility for Clark County's foster care system and are required to
          ensure that Clark County is complying with state and federal law.  The complaint
25        also alleges that all of the defendants had knowledge of independent reports

documenting the systemic failures of foster care in Nevada.  But it does not allege that Willden or Comeaux had any personal knowledge of the specific constitutional violations that led to Plaintiffs' injuries, or that they had any direct responsibility to train or supervise the caseworkers employed by Clark County.

*Id.* at 1004.

In their present motion, State Defendants argue that Plaintiffs have failed to cure the lack of a sufficient claim of personal involvement by Willden or Comeaux.  The Court agrees.  Other than to identify them or specify their duties generally, the seventy-two-page AC mentions Willden or Comeaux in eleven paragraphs, never in connection with any failing with respect to a particular Plaintiff. (*See* Am. Compl. ¶¶ 7–8, 47, 49, 52, 81, 103–04, 127, 142, 161).  Plaintiffs allege: (1) Willden received a letter from a federal official in 2006 informing him that the child welfare system in Clark County "should be of grave concern to the State"; (2) Willden then passed these concerns on to Morton; (3) Willden and Comeaux were responsible for the implementation of federal child welfare and Medicaid programs in Nevada; (4) Willden and Comeaux received a letter from a legal aid organization in 2008 listing the organization's concerns with the mental health services provided to foster children in Clark County; (5) Comeaux testified before the Nevada Legislature in 2009 that the state was not accurately tracking the psychotropic medications of foster children or providing relevant information to their caseworkers; (6) Willden testified before the Nevada Legislature in 2007 that there were failures in child abuse investigations, including the failure to interview siblings of victims of reported abuse; (7) Willden was presumably aware of a 2006 report concerning deficiencies in out-of-state placements; and (8) Comeaux authored a 2011 report noting that only 53% of children had case plans.

As in the Complaint, the AC simply lists Willden's and Comeaux's various duties and alleges a systematic failure to ensure they were carried out, the kind of supervisory responsibility claim that is not cognizable under § 1983.  Items five through eight above are of most concern,

1    but these allegations of knowledge of general problems do not indicate acquiescence or

2    indifference to failures in any particular case or even generally.  The Court therefore dismisses

3    the substantive due process claims against Willden and Comeaux in their individual capacities.

4         Finally, State Defendants argue that certain claims for injunctive relief are moot because

5    only Plaintiffs Henry A. and Mason I. remain in the custody of any Defendant.  The Court agrees.

6    The claims for injunctive relief are therefore dismissed as moot, except as to Henry A. and

7    Mason I.  Those Plaintiffs have standing to assert claims for injunctive relief consisting of failure

8    to provide mental health information to foster parents (Henry A.), failure to investigate reports of

9    abuse (Mason I.), and failure to inspect out-of-state facilities (Mason I.).

10         **2.    Adoption Assistance and Child Welfare Act**

11        The Court of Appeals reversed the Court's previous ruling that there was no private cause

12   of action under the relevant provisions of the AACWA. *See Henry A.*, 673 F.3d at 1006–09.

13   Neither the Court nor the Court of Appeals on appeal addressed the substantive sufficiency of

14   those claims or whether State Defendants were entitled to qualified immunity against those

15   claims in their official capacities.  State Defendants now challenge those claims in their

16   individual capacities (Willden and Comeaux), in part and as presented in the AC, and assert

17   qualified immunity against them.

18        Specifically, State Defendants argue that Plaintiffs have failed to state a claim for failing

19   to update records or provide information to foster parents.  The Court agrees that Plaintiffs have

20   not sufficiently alleged the personal involvement of Willden or Comeaux in these failures such

21   that Plaintiffs might be entitled to money damages against them under § 1983. *See supra* Part

22   III.A.1.  Again, Howell is only sued in her official capacity.  As with the substantive due process

23   claims, the present claim is moot as to injunctive relief, except as to Plaintiffs Henry A. and

24   Mason I.

25   ///

1      **3.      Monetary Damages Against State Defendants**

2          "The Judicial power of the United States shall not be construed to extend to any suit in

3    law or equity, commenced or prosecuted against one of the United States by Citizens of another

4    State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  Although the text

5    of the Eleventh Amendment does not explicitly so indicate, it grants a state immunity from suit

6    by its own citizens, as well. *Hans v. Louisiana*, 134 U.S. 1, 10 (1890).  In a related analysis, but

7    strictly independent of sovereign immunity, § 1983 only permits suit against "persons."  Neither

8    a state nor its employees acting in their official capacities are "person[s]" who can be sued under

9    § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989), but state employees sued in

10   their individual capacities are "persons" who can be sued under § 1983, *Hafer v. Melo*, 502 U.S.

11   21, 27 (1991).  Furthermore, state employees sued in their individual capacities for injunctive

12   relief or for damages to be paid out of their private resources are not protected by a state's

13   sovereign immunity. *Edelman v. Jordan*, 415 U.S. 651, 66465 (1974); *Ex parte Young*, 209 U.S.

14   123, 15960 (1908).

15        Nevada has explicitly declined to waive its Eleventh Amendment immunity. *See* Nev.

16   Rev. Stat. § 41.031(3).  The Ninth Circuit has twice held that under this statute Nevada state

17   entities retain Eleventh Amendment protection from suit in federal court. *See Romano v. Bible*,

18   169 F.3d 1182, 1185 (9th Cir.1999) (Nevada Gaming Control Board); *Austin v. State Indus. Ins.*

19   *Sys.*, 939 F.2d 676, 678 (9th Cir.1991) (State Industrial Insurance System).  The Nevada Supreme

20   Court has also noted that state entities in Nevada are immune from suit in federal court under the

21   Eleventh Amendment.  A Defendant waives its Eleventh Amendment immunity from suit,

22   however, when it removes a case to federal court. *Embury v. King*, 361 F.3d 562, 566 (9th Cir.

23   2004).  State Defendants did not remove this case, and they are therefore protected by the

24

25

1    Eleventh Amendment.[2]  Therefore, under the Eleventh Amendment, State Defendants Willden

2    and Comeaux are potentially amenable to money damages in their individual capacities only.

3    This protection applies to all claims, not only the federal claims, because the Eleventh

4    Amendment provides protection from suits by citizens against states in federal court altogether; it

5    is not simply a limitation against federal causes of action. *See Pennhurst State Sch. & Hosp. v.*

6    *Halderman*, 465 U.S. 89, 103–21 (1984) ("[A] federal suit against state officials on the basis of

7    state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered

8    has an impact directly on the State itself").  The Court has no jurisdiction to order official

9    capacity relief against the State of Nevada or its officials unless Nevada has waived the

10   jurisdictional limitation in the Eleventh Amendment, which it has expressly refused to do

11   legislatively as a general matter and has not done as a practical matter via removal in the present

12   case.  The Court therefore grants State Defendants' motion to the extent it asks the Court to

13   dismiss official capacity claims for monetary damages.

14           State Defendants also argue that Plaintiffs have not sufficiently pled entitlement to money

15   damages against them in their individual capacities.[3]  State Defendants argue that Plaintiffs have

16   not pled which specific actions by State Defendants caused the alleged violations.  Plaintiffs must

17   plead: "(1) a constitutional violation; (2) caused by specific behavior of an individual defendant;

18   (3) entitling them to money damages from that individual." *Suever v. Connell*, 579 F.3d 1047,

19   1061 (9th Cir. 2009).  Defendants must be put on notice of "specific, individual actions." *Id.*

20   Plaintiffs have not sufficiently pled specific actions against Willden and Comeaux; the analysis is

21   provided, *supra*, in Part III.A.1.

22   ///

23   _____

24           [2]Also, State Defendants in their official capacities are not "persons" who can be sued
     under § 1983.

25           [3]Only Willden and Comeaux are sued in their individual capacities.

1          **4.      Case Plan Claim**

2          As with the "providing information" claim under the AACWA, addressed *supra*, State

3   Defendants argue that Plaintiffs have failed sufficiently to implicate Willden or Comeaux

4   personally in any failures to timely file initial case plans under AACWA.  The Court agrees.

5   Plaintiffs have alleged no specific failure to train or any personal involvement, but only poor

6   management.

7          State Defendants also argue that these claims may be moot or that Plaintiffs may lack

8   standing to bring them.  State Defendants note that the AC lists Henry A. and Mason I. as the

9   class representatives for the "timely initial case plan" claims. (*See* Am. Compl. ¶ 149).  State

10  Defendants argue these Plaintiffs do not have standing to assert their own claims or the claims of

11  others, because they do not allege having not received a case plan within sixty (60) days of

12  removal from their homes, which is the minimum requirement under 45 C.F.R. § 1356.21(g)(2).

13  An examination of the AC reveals no specific allegation that either of these Plaintiffs did not

14  receive an initial case plan within sixty days. Plaintiffs allege only that "on information and

15  belief," Henry A. and Mason I. are members of the class. (*See* Am. Compl. ¶ 149).  The class is

16  in turn defined as those placed into foster care "for whom a case plan in compliance with federal

17  and state requirements has not been prepared." (*Id.* ¶ 148).  Paragraph 149 simply incorporates

18  the conclusory class definition from paragraph 148.  The Court therefore grants the motion to

19  dismiss in this regard, with leave to amend.

20         State Defendants also argue that such claims are moot as to any Plaintiff, such as Henry

21  A. and Mason I., who have been removed for over sixty days, because the State cannot now

22  provide such persons with an initial case plan within sixty days of removal.  The Court agrees

23  only in part.  In cases where a sufficient case plan has been provided, but untimely so, the failure

24  to provide a timely initial case plan cannot be remedied via an injunction.  However, the failure

25  can be remedied through injunctive relief in those cases where no case plan has ever been

provided, because such children suffer a continuing harm.  But in any case, Plaintiffs must plead

facts indicating a plausible violation, not simply recite the standards and allege Defendants

violated them.

**5.      Negligence**

In Nevada, certain government actors have discretionary immunity from common law

claims. *See* Nev. Rev. Stat. § 41.032.  This section of the code immediately follows the section

that waives the state's common law sovereign immunity but retains the state's Eleventh

Amendment protection. *See id.* § 41.031.  The discretionary immunity statute applies to actions

brought "against an immune contractor or an officer or employee of the State or any of its

agencies or political subdivisions." *See id.* § 41.032.  On its face, the statute does not necessarily

immunize municipal governments or their employees, because in some contexts municipalities

are considered independent corporations or "persons" with their own identities, not mere political

subdivisions of the state, at least in the eyes of Congress. *See Monell v. Dep't of Social Servs. of

City of N.Y.*, 436 U.S. 658, 690 (1978).  The Nevada Supreme Court, however, has always

assumed that municipalities are political subdivisions of the state for the purposes of the

discretionary immunity statute. *See, e.g.*, *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353,

1354–55 (Nev. 1987).  This construction is consistent with *Monell*, because the discretionary

immunity statute only protects state and municipal agencies against state causes of action, such

as the present negligence claim.

The question remains whether there is discretionary immunity as a matter of law in this

case.  The statute immunizes municipal agencies and their employees against actions:

> [b]ased upon the exercise or performance or the failure to exercise or perform a
> discretionary function or duty on the part of the State or any of its agencies or
> political subdivisions or of any officer, employee or immune contractor of any of
> these, whether or not the discretion involved is abused.

Nev. Rev. Stat. § 41.032(2).  In interpreting this statute, the Nevada Supreme Court has explicitly

adopted the two-part test for discretionary immunity under the Federal Tort Claims Act, under which there is discretionary immunity when: (1) the allegedly negligent acts involve elements of judgment or choice; (2) and the judgment or choice made involves social, economic, or political policy considerations. *Martinez v. Maruszczak*, 168 P.3d 720, 722 (Nev.2007) (citing *Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991)).  Under this standard, a court does not ask whether the official abused his or her discretion, *see* Nev. Rev. Stat. § 41.032(2), but only whether the acts concerned a matter in which the official had discretion.  In other words, the immunity is not infinitely broad, but once it is determined that the acts at issue were within the breadth of the statute, i.e., that they involved judgment or choice on social, economic, or political policy considerations, the immunity then applies even to abuses of discretion.  Still, there is no discretionary immunity for acts taken in "bad faith," which is a subjective failure that is worse than an objective abuse of discretion. *See Falline v. GNLV Corp.*, 823 P.2d 888 (1991); *accord Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996) (equating "bad faith" in this context with "malice or willfulness").  The *Falline* Court held that "bad faith" encompasses acts that are completely outside the authority of an official: "Bad faith ... involves an implemented attitude that completely transcends the circumference of authority granted the individual or entity.  In other words, an abuse of discretion occurs within the circumference of authority, and an act or omission of bad faith occurs outside the circumference of authority." *Id.* at 892 n. 3.  In *Davis v. City of Las Vegas*, the Ninth Circuit noted that under *Falline*, "where an officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest [an objective abuse of discretion], but instead because of hostility toward a suspect or a particular class of suspects (such as members of racial minority groups) or because of a willful or deliberate disregard for the rights of a particular citizen or citizens [a subjective abuse of power], the officer's actions are the result of bad faith and he is not immune from suit." 478 F .3d 1048, 1060 (9th Cir. 2007).  The difference between a

non-actionable abuse of discretion and an actionable bad-faith violation of rights therefore

appears to turn on the state actor's mental state; when he crosses the line from recklessness as to

a person's rights to malicious intent to violate them, he is no longer protected by the

discretionary immunity statute, even if he initially satisfies the two-part test under *Martinez*.

In this case, the first prong of discretionary immunity is satisfied, because decisions

concerning the placement of wards of the state into homes of relatives, foster homes, or group

homes clearly involves personal deliberation and judgment.  This prong of the test is usually easy

to satisfy—a task must simply involve some element of personal deliberation and choice so as

not to be purely ministerial.

The second prong of the test is trickier to apply. It focuses on the purposes of

discretionary immunity:

> Because the FTCA's discretionary-function exception is not a bright-line rule, federal
> courts applying the *Berkovitz–Gaubert* test must assess cases on their facts, keeping
> in mind Congress' purpose in enacting the exception: "to prevent judicial
> 'second-guessing' of legislative and administrative decisions grounded in social,
> economic, and political policy through the medium of an action in tort." Thus, if the
> injury-producing conduct is an integral part of governmental policy-making or
> planning, if the imposition of liability might jeopardize the quality of the
> governmental process, or if the legislative or executive branch's power or
> responsibility would be usurped, immunity will likely attach under the second
> criterion.
>
> ....
>
> We therefore adopt the *Berkovitz–Gaubert* approach and clarify that to fall within the
> scope of discretionary-act immunity, a decision must (1) involve an element of
> individual judgment or choice and (2) be based on considerations of social,
> economic, or political policy.  In this, we clarify that decisions at all levels of
> government, including frequent or routine decisions, may be protected by
> discretionary-act immunity, if the decisions require analysis of government policy
> concerns.  However, discretionary decisions that fail to meet the second criterion of
> this test remain unprotected by NRS 41.032(2)'s discretionary-act immunity.
>
> Under the *Berkovitz–Gaubert* test, the decision to create and operate a public hospital
> and the college of medicine are the type of decisions entitled to
> discretionary-function immunity, because those decisions satisfy both prongs of the
> *Berkovitz–Gaubert* test; namely, they involve elements of judgment and choice, and
> they relate to social and economic policy.  But, while a physician's diagnostic and

1    treatment decisions involve judgment and choice, thus satisfying the test's first
2    criterion, those decisions generally do not include policy considerations, as required
     by the test's second criterion. In this case, as Dr. Martinez did not engage in
3    policy-making decisions in his treatment of Mr. Maruszczak, he is not entitled to
     immunity from suit under NRS 41.032(2).

4    *Martinez*, 168 P.3d at 729 (footnotes omitted). The *Martinez* Court rejected the previously used

5    discretionary—ministerial test, under which liability could only attach where a government actor

6    was bound to act in a narrowly particular way and strayed from that direction. *See id.* at 727 n.27

7    (citing *Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d 932, 934 (Nev. 1994)). *Martinez*

8    clarified that officials could be liable even where they exercised judgment if that judgment was

9    not akin to social, economic, or political policy-making, but the case still did not distinguish

10   between (1) exercising judgment in a way totally divorced from any existing policies and (2)

11   exercising judgment in a way motivated by existing policies.

12         The Nevada Supreme Court has applied *Martinez* several times, and it answered the

13   question posed above in the latest such case. In *Butler ex rel. Butler v. Bayer*, the Court ruled

14   that defendants were not entitled to discretionary immunity as against a negligence claim for

15   releasing a quadriplegic inmate outside his girlfriend's trailer when she was not home and when

16   the trailer had not been prepared to receive him as planned. 168 P.3d 1055, 1059–60, 1067 (Nev.

17   2007). Although the act involved personal judgment, it did not involve policy-making

18   considerations. Later, in *City of Boulder City v. Boulder Excavating, Inc.*, the Court ruled that a

19   city engineer who requested that a contractor replace one of its subcontractors had discretionary

20   immunity against the subcontractor's claims for defamation and intentional interference with

21   contractual relationship, because the city engineer was executing city policy that was based upon

22   public policy considerations—the city had experienced problems in dealing with the plaintiff

23   company in the past. 191 P.3d 1175, 1177, 1180–81 (Nev. 2008). The *Boulder Excavating* Court

24   thus took the first step in answering the question posed, *supra*. Most recently, in *Ransdell v.*

25   *Clark County*, the Court answered the question clearly when it ruled that where there is no

1   particular policy or statute in place making the act at issue a purely ministerial one, but where the

2   actor's personal decision is made in furtherance of stated goals and policies, the statute protects

3   the actor. 192 P.3d 756, 763 (Nev. 2009).   In *Ransdell*, a county inspector obtained a warrant to

4   have debris involuntarily removed from Mr. Ransdell's property when he refused to remove it

5   himself after several complaints, inspections, citations, and extensions of time. *See id.* at 759.

6   The County removed the debris, and Mr. Ransdell brought § 1983 and state law tort claims

7   against the County. *Id.* at 759–60.   Applying *Martinez* and examining a factually similar case

8   from Iowa (which, like Nevada, had adopted the *Berkovitz–Gaubert* test), the Court ruled that the

9   second prong of the test was satisfied "because the goals of the County in abating Ransdell's

10  property were motivated by environmental, health, and economic policies supported by Clark

11  County Code and statutory authority." *Id.* at 763.

12      *Ransdell* does much to clarify the scope of an every-day actor's immunity.   After

13  *Martinez* but before *Ransdell*, it appeared that every-day actors such as county inspectors and

14  police officers would not be immune under the statute unless their actions were ministerial tasks

15  particularly commanded by ordinances or official policies.   Acts involving every-day

16  implementation of policy choices, but which did not themselves consist of policy choices, did not

17  appear to be protected.   *Ransdell* makes it clear that individual acts involving the implementation

18  of covered types of policy choices are protected under the discretionary immunity statute. *Id.* at

19  764 ("[B]ecause the County's actions were grounded on public policy concerns, as expressed in

20  the County Code and Nevada's abatement statute, they fit within the second criterion of the

21  *Berkovitz–Gaubert* test.").

22      Here, it is clear that as a general matter the management of the placement of wards of the

23  state involve elements of judgment and choice and that Defendants' choices in the present

24

25

1   matters, no matter how poor they may have been,[4] were grounded on public policy concerns as

2   expressed in the Nevada Revised Statutes.  And Plaintiffs have not alleged malicious bad faith,

3   but rather objective negligence, however gross.  Still, Plaintiffs allege that Defendants were

4   bound by federal law to perform certain ministerial tasks, and that although Defendants may have

5   had some range of discretion in how they performed those tasks, they certainly had no discretion

6   to fail to perform the required tasks altogether.  The ministerial tasks commanded by law that

7   Plaintiffs argue Defendants failed to perform, and which therefore prevent discretionary

8   immunity as to any harm resulting from the failure, are those ministerial tasks required by the

9   "case plan" provisions in 42 U.S.C. §§ 671(a)(16) and 675(1) and the "records provision"

10  provisions under §§ 671(a)(16), 675(1), and 675(5)(d).  Plaintiffs have brought claims directly

11  under those statutes for injunctive relief.  The present negligence action is a state law vehicle to

12  obtain money damages for failures under those statutes.

13          In summary, the present negligence claim is barred by the discretionary immunity statute

14  insofar as Plaintiffs allege Defendants violated the general duty of care—the Nevada Legislature

15  has via the discretionary immunity statute removed a jury's ability to second-guess a state

16  official's discretion in performing his duties according to that standard—but it is not necessarily

17  barred insofar as it consists of a negligence per se claim premised upon the violation of

18  nonnegotiable statutory duties.  Adherence to specific statutory commands involves no

19  discretion.

20

21  _____

22          [4]The Court states no opinion on whether the State's or County's choices were "poor" in
    these cases.  All parties can agree that the circumstances presented in this case are terrible, and
23  that the ultimate responsibility for the suffering in these cases was the bad parents and foster
    parents involved.  The Court is aware that welfare agencies, like most public agencies, face
    difficult dilemmas with no "good" options in many instances and must make the best decision
24  they can with the resources available.  The federal and state legislatures recognize this, as well,
    hence the discretionary immunity doctrines at both the federal and state levels.

25

1   Here, the statutes alleged to have been violated are both federal and state.  A federal

2   statute can in theory provide the floor of care under a state law negligence per se theory. *See Paul*

3   Sherman, *Use of Federal Statutes in Negligence Per Se Actions*, 13 Whittier L. Rev. 831,

4   883–905 (1992).  The Nevada Supreme Court has not opined on the question, but the California

5   Court of Appeals has called the theory that a federal statute can set the floor of care in a state law

6   negligence action "dubious" in dicta. *See Asplund v. Selected Invs. in Fin. Equities, Inc.*, 103 Cal.

7   Rptr. 2d 34, 47 (Cal. Ct. App. 2000).  The fact that the State of Nevada has chosen to accept

8   federal funds tied to the conditions at issue in this case could be said to reflect the judgment of

9   the State that those conditions are appropriate standards for the conduct of its agencies.  If so,

10  adoption of the federal standards for a negligence per se theory might be appropriate.  In Nevada,

11  negligence per se exists where: (1) the plaintiff can show that the defendant has violated a duty

12  imposed by statute; (2) the plaintiff is a member of the class of persons intended to be protected

13  by the statute or regulation; and (3) the harm is of the kind intended to be prevented by the

14  statute. *See Ashwood v. Clark Cnty.*, 930 P.2d 740, 743–44 (Nev. 1997) (citing *Sagebrush Ltd. v.*

15  *Carson City*, 660 P.2d 1013, 1015 (Nev. 1983)); Restatement (Second) of Torts § 286.

16  In Nevada, the theory is only available where the Nevada Legislature has adopted the

17  statute.  It is possible that a federal statute could provide the floor of care under Nevada's

18  common law negligence action where the Nevada Legislature has later adopted the federal statute

19  in some way.  But if the Governor or another executive official is solely responsible for the

20  acceptance of the federal funds and attendant conditions, those conditions do not set the floor of

21  care for a negligence action under Nevada's common law because the Nevada Legislature has not

22  itself adopted those conditions.  If it is the Governor or some other administrative official, and

23  not the Nevada Legislature, who has accepted the federal funds and attendant conditions, then a

24  violation of those conditions would not be negligence per se, but only *evidence* of negligence.

25  *See Price v. Sinnott*, 460 P.2d 837, 839–40 (Nev. 1969) ("[W]e do not agree that a violation of an

1 administrative regulation is negligence per se, since it lacks the force and effect of a substantive

2 legislative enactment. . . . We prefer the rule that proof of a deviation from an administrative

3 regulation is only evidence of negligence; not negligence per se." (citations omitted)).  In such a

4 case, Nevada's discretionary immunity statute would render any amount of evidence of

5 negligence under the general standard moot where it applies.

6          The AACWA requires states to submit its plans under the Act to the Secretary of the

7 Social Security Administration. *See* Adoption Assistance and Child Welfare Act of 1980

8 § 101(a)(1), Pub. L. 96-272, 94 Stat. 500, 501 (1980).  The Act refers only to the "State" and the

9 "State agency," and does not appear to refer to state legislatures or require any act by a state

10 legislature for a state to qualify for assistance under the Act. *See generally id.*  The Act was later

11 amended by the Adoption and Safe Families Act of 1997 ("ASFA"), Pub. L. 105-89, 111 Stat.

12 2115 (1997), which uses the same terminology, although it refers to "State legislature[s]" in the

13 context of opting out of certain procedures.  Section 501 of the ASFA makes a special provision

14 for delay of its effective date "if state legislation [is] required" to implement it, indicating that

15 state legislation is not as a rule contemplated for a state's participation.  The name of neither Act

16 appears in the Nevada Revised Statutes or the Nevada Administrative Code.  Plaintiffs do not

17 allege that the Nevada Legislature has itself adopted the standards of care upon which the State's

18 acceptance of federal funds is conditioned.  Therefore, although the violation of those standards

19 would provide a basis for the Secretary of Health and Human Services to cease funding, and

20 Plaintiffs have claims for an injunction to comply with the federal statutes, they have no

21 negligence per se claim for damages under Nevada's common law.

22          In summary, Defendants have discretionary immunity from claims alleging a violation of

23 the general duty of care, and insofar as Plaintiffs mean to imply a negligence per se theory based

24 upon the AACWA or the ASFA, they have failed to allege a violation of a statutory floor of care

25 set by the Nevada Legislature that is not obviated by Nevada's discretionary immunity statute.

1   The Court therefore dismisses the negligence claim with respect to alleged violations of federal

2   statutes.

3          Plaintiffs also allege the violation of state laws, however.  The negligence per se claim is

4   prevented by the discretionary immunity statute insofar as Plaintiffs allege violations of the

5   Nevada Administrative Code, because violations of the Code are only evidence of negligence,

6   not negligence per se.  Plaintiffs, however, also allege violations of sections 432B.260, 424.038,

7   432.0177, and 127.330 of the Nevada Revised Statutes, and violations of these statutes can

8   provide a basis for a negligence per se claim against which there is no discretionary immunity if

9   the sections mandate nondiscretionary, ministerial tasks. (*See* Am. Compl. ¶ 204).

10          Section 432B.260 mandates reports, investigations, and evaluation upon receiving

11   information concerning possible child abuse or neglect. *See* Nev. Rev. Stat. § 432B.260.

12   Plaintiffs allege that Defendants failed to initiate investigations after receiving reports of the

13   possible abuse or neglect of a child. (*See id.* ¶ 204(b)).  This allegation is conclusory as stated

14   within the negligence claim itself, but that claim incorporates all previous allegations (*See id.*

15   ¶ 202).  The Court finds that Plaintiffs Christine F. and Mason I. have sufficiently made out a

16   negligence per se claim not barred by discretionary immunity under section 432B.260, but the

17   other Plaintiffs have not.  Christine F. and Mason I. allege that Defendants had reports of, or

18   access to information indicating, abuse, and that they failed to take any investigative action.

19   Olivia G. alleges that Defendants failed to remove her despite reports of abuse but does not

20   allege Defendants failed to investigate.  The Court dismisses the claim as to all Plaintiffs except

21   Christine F. and Mason I., with leave to amend.

22          Section 424.038 mandates counseling of foster parents by the placement agency

23   concerning any available medical and behavioral history of the child before placement. *See id.*

24   § 424.038.  Plaintiffs Olivia G., Christine F., and Mason I. have sufficiently made out a

25   negligence per se claim not barred by discretionary immunity under section 424.038, but the

other Plaintiffs have not.  The Court dismisses the claim as to all Plaintiffs except Olivia G., Christine F., and Mason I., with leave to amend.

Section 432.0177 mandates an inspection of any out-of-state placement facility before placement. *See id.* § 432.0177.  Plaintiff Mason I. is the only Plaintiff alleged to have been placed out of state, at the NDA in Florida.  However, he only alleges that Defendants placed him there "without ensuring that it was safe and capable of meeting Mason's need" and that they "never once visited the facility . . . while he was there." (Am. Compl. ¶ 28).  These allegations are not inconsistent with a pre-placement visit.  That is, even if these allegations are true, they do not make out a claim that NDCFS failed to physically inspect the facility before Mason I. arrived.  It is possible that NDCFS physically inspected the NDA but still did not "ensur[e] that it was safe and capable of meeting Mason's need" (in Plaintiff's opinion).  The Court therefore dismisses the claim as to all Plaintiffs, with leave to amend.

Section 127.330 is the legislatively adopted text of the Interstate Compact on the Placement of Children (the "Compact").  Article III of the Compact requires the sending agency to provide the receiving state with certain information concerning the child. *See* Nev. Rev. Stat. § 127.330 art. III.  Neither Mason I. nor any other Plaintiff alleges a violation of the Compact. The Court therefore dismisses the claim as to all Plaintiffs, with leave to amend.

### B.    County Defendants' Motion

#### 1.    Case Plan Claim

County Defendants repeat State Defendants arguments concerning standing and mootness as to the "case plan" claim.

#### 2.    Anonymity

County Defendants argue that although the minor Plaintiffs may presumably proceed anonymously, there is no basis to permit the adult "next friends" of these Plaintiffs bringing suit on their behalf to proceed anonymously themselves.  County Defendants note that the Court

previously failed to address this argument when County Defendants last made it.  County

Defendants ask the Court to require Plaintiffs to follow the mandatory procedure for obtaining

leave to proceed anonymously in federal court.  Recently, in *Doe v. Kamehameha Schools*, 596

F.3d 1036 (9th Cir. 2010), the Court of Appeals recited the analytic framework for such a

request:

> To determine whether to allow a party to proceed anonymously when the
> opposing party has objected, a district court must balance five factors: "(1) the
> severity of the threatened harm, (2) the reasonableness of the anonymous party's
> fears, . . . (3) the anonymous party's vulnerability to such retaliation," (4) the
> prejudice to the opposing party, and (5) the public interest.

*Id.* at 1042 (quoting *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir.

2000) (citations omitted)).

The Court finds that there is as good a reason to permit the next friends in this case to

proceed anonymously as there is to permit the Plaintiffs themselves to proceed anonymously.

Plaintiffs are minors alleging abuse and neglect, in some cases sexual abuse.  As Plaintiffs argue

in response, and as they note they have alleged in the AC, the identification of their next friends

could easily cause the Plaintiffs themselves to be identified.  The Court finds that the need for

anonymity in this case outweighs the public's need to know Plaintiffs' identities (or those of their

next friends).  The mental anguish that Plaintiffs could suffer if their history of abuse became

public could be severe, and such fears are reasonable.  It cannot be expected that the public

media will not disseminate such information widely if known.  Public media outlets will of

course race one another to obtain and disseminate such information.  These Plaintiffs are

extremely vulnerable to this kind of dissemination of private information.  They would be utterly

unable to stop it under the First Amendment once the information was released.  Defendants will

suffer no prejudice form Plaintiffs' procedural anonymity because they themselves will have

access to the information during their defense.  This is not a case where a criminal defendant

asserts his Sixth Amendment right to confront his accuser at a public trial.  Finally, the public has

little interest in the names of these Plaintiffs.  The public has access to every other facet of the case.  Its concern, if any, is with the state of the child welfare system, not with any of the particular cases at issue.

**CONCLUSION**

IT IS HEREBY ORDERED that the Motions to Dismiss (ECF Nos. 107, 108) are GRANTED IN PART and DENIED IN PART, as follows:

(1) The substantive due process claims, both federal and state, are dismissed as against Defendants Willden and Comeaux insofar as they seek damages against them in their individual capacities.  Under the law of the case, however, no Defendants have qualified immunity at the dismissal stage.  The claims for injunctive relief are moot except as to failure to provide health information to foster parents (Henry A.), failure to investigate reports of abuse (Mason I.), and failure to inspect out-of-state facilities (Mason I.).

(2) The Eleventh Amendment protects State Defendants in their official capacities from money damages as to any claim.

(3) The AACWA "records provision" claim is dismissed as to money damages against Willden and Comeaux in their individual capacities, and the claim for injunctive relief is moot, except as to Plaintiffs Henry A. and Mason I.  The AACWA "case plan" claim is dismissed as to all Defendants, with leave to amend.

(4) The negligence claim is dismissed under the discretionary immunity statute, except as to Christine F.'s and Mason I.'s claims invoking a negligence per se theory under NRS section 432B.260 and Olivia G.'s, Christine F.'s, and Mason I.'s claims invoking a negligence per se theory under NRS section 424.038.  Plaintiffs may amend their negligence claim to plead negligence per se theories based upon violations of state statutes, but not based upon violations of federal law or state administrative regulations.

IT IS SO ORDERED.

1   Dated this 27th day of February, 2013.

2

3   _____
    ROBERT C. JONES

4   United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25