1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                         DISTRICT OF NEVADA

8

HENRY A. et al.,                    )
9                                   )
                Plaintiffs,         )
10                                  )         2:10-cv-00528-RCJ-PAL
        vs.                         )
11                                  )
MICHAEL WILLDEN et al.,             )              ORDER
12                                  )
                Defendants.         )
13 _____ )

14         This case arises out of the alleged failure of Nevada and Clark County officials to

15 adequately protect foster children.  Pending before the Court are County Defendants' Motion to

16 Disqualify Counsel (ECF No. 313), Defendant Philomena Osemwengie's Motion for Summary

17 Judgment (ECF No. 288), and Third-Party Defendant National Deaf Academy, LLC's ("NDA")

18 Motion to Dismiss or Stay and to Transfer Venue (ECF No. 280).  For the reasons given herein,

19 the Court grants the motion to dismiss for lack of personal jurisdiction and will hear argument on

20 the motions for summary judgment and to disqualify counsel at the hearing currently scheduled

21 for May 15, 2014.

22 **I.      FACTS AND PROCEDURAL HISTORY**

23         Plaintiffs are eleven children who claim to have been harmed due to the failure of state

24 and county child welfare authorities to adhere to certain mandatory laws and regulations and to

25 ensure their safety as a general matter.  Their injuries include abuse and neglect by foster parents

1    and institutional guardians, as well as a lack of medical care due to authorities' refusal to
2    authorize or monitor it.

3         Plaintiff Henry A. is a fourteen-year-old boy who was placed into foster care by the Clark
4    County Department of Family Services ("CCDFS") and the Nevada Division of Children and
5    Family Services ("NDCFS") from 2005 until February 2013, when he was returned to his
6    mother's care. (Second Am. Compl. ¶ 20, July 12, 2013, ECF No. 176).  He suffers from severe
7    mental health problems but his treatment has been sporadic because of his placement with over
8    forty foster families and six or seven caseworkers during his first seven years under CCDFS. (*See*
9    *id.*).  He has changed mental health providers over ten times. (*Id.*).  He has been prescribed
10   multiple psychotropic drugs and once overdosed because of a combination of these drugs,
11   spending several weeks in the intensive care unit. (*Id.*).

12        Plaintiffs Charles B. and Charlotte B. are siblings, ages twelve and four, respectively. (*Id.*
13   ¶ 21).  They were placed into seventeen different placements for foster care by CCDFS from
14   March 2009 to the Fall of 2010, when they were returned to their mother's care. (*Id.*).  CCDFS
15   placed Charles and Charlotte with foster parents in March 2009 despite a court order requiring
16   placement with their grandmother. (*Id.*).  One foster mother and her teenage son abused them,
17   including locking Charlotte in a closet with no food, water, or sanitation for long periods of time
18   and beating Charles when he tried to help his sister. (*Id.*).  The police eventually removed them
19   and took them to the hospital for treatment. (*Id.*).  Charlotte was suffering from dehydration, cuts,
20   bruises, and severe (bleeding) diaper rash. (*Id.*).  The foster mother has been charged with child
21   abuse, and her son has pled guilty to assault. (*Id.*).

22        Plaintiff Linda E. is a twenty-year-old woman who was placed into more than forty
23   different placements for foster care by CCDFS and NDCFS for over fifteen years. (*Id.* ¶ 22).  She
24   suffered abuse and neglect in many of these placements, including being placed into the home of
25   an aunt where she had previously suffered unspecified abuse. (*Id.*).  Linda reported the abuse to

1  her caseworker. (*Id.*).  She did not receive proper medical and psychiatric care. (*Id.*).

2      Plaintiffs Leo and Victor C. are twenty-year-old twins who were placed into foster care by

3  CCDFS in November 2006. (*Id.* ¶ 23).  Leo left the system when he became an adult in

4  December 2010. (*Id.*).  Victor, however, chose to remain in the system after age eighteen and

5  now receives benefits under Assembly Bill 350. (*Id.*).  Defendants refused to place Leo and

6  Victor in the care of their grandmother, who was ready, willing, and able to provide a safe and

7  appropriate environment for them, instead moving them between their father and their mother

8  and her boyfriend, where they suffered unspecified abuse. (*Id.*).  Eventually, either their mother

9  or father abandoned them at Child Haven. (*See id.*).  Defendants failed to provide psychiatric care

10  despite Victor's suicidal threats. (*Id.*).  Plaintiffs do not allege any untreated psychiatric

11  conditions of Leo.

12      Plaintiffs Maizy and Jonathan D. are siblings. (*Id.* ¶ 24).  Maizy and Jonathan are ages

13  eight and seven, respectively, and were placed into foster care by CCDFS from late 2005 to

14  August 2009. (*Id.*).  As infants, Defendants placed them with Child Haven, where they did not

15  receive basic nutrition and medical care. (*Id.*).  They were kept on a "formula diet" despite

16  outgrowing it. (*Id.*).  Maizy and Jonathan were left in their cribs with limited interaction with

17  other children and adults, resulting in a diagnosis (presumably by a doctor, though not explicitly

18  so alleged) with "failure to thrive," based upon being underweight due to environmental factors.

19  (*See id.*).  S.W. has adopted both children. (*Id.*).  Defendants have failed to provide authorization

20  for at least three medical procedures for the children despite S.W.'s efforts. (*Id.* ¶ 25).  The

21  related conditions became so severe that doctors proceeded with the procedures on an emergency

22  basis. (*Id.*).  As a result, Jonathan has a misshapen colon that must be surgically corrected due to

23  Defendants' failure to authorize removal of calcified stool from his colon. (*Id.*).

24      Plaintiff Olivia G. is a twelve-year-old girl who was placed into foster care by CCDFS

25  from January 2006 to 2011. (*Id.* ¶ 26).  Defendants failed to remove her from the custody of her

1  parents despite reports that she was being abused. (*Id.*).  She was initially placed with various

2  relatives without any effort to determine if they were able to provide appropriate care. (*Id.*).  She

3  was abused in some of those homes, including being beaten with a belt. (*Id.*).  She has severely

4  impaired neuropsychological functioning and several cognitive and behavioral impairments as a

5  result. (*Id.*).  She was also prescribed multiple psychotropic drugs without adequate care and

6  monitoring, including being placed with E.F. without providing E.F. the information and

7  authorizations required to obtain Olivia's prescriptions. (*Id.*).

8         Plaintiff Christine F. is a six-year-old girl who was placed into foster care by CCDFS

9  from May 2008 to June 2010, when E.F. adopted her. (*Id.* ¶ 27).  Christine is severely

10  developmentally delayed and suffers form permanent disabilities and a seizure disorder due to

11  having fallen from a second-story window at the home of her mother, grandmother, and two

12  uncles. (*See id.*).  Despite marks around her ankles indicating she had been dangled from the

13  window or been swung into a wall, CCDFS did not investigate and take custody of Christine

14  until her parents refused to authorize medical treatment necessary to treat her injuries. (*Id.*).

15  Defendants later failed to provide E.F. with Christine's seizure medications and offered no

16  medical support or training on how to care for her special needs. (*Id.*).  Defendants have also

17  permitted her grandmother to visit her despite knowing of past allegations of abuse against her

18  and that she was watching over Christine when she fell from the window. (*Id.*).[1]

19         Plaintiff Mason I. is a fifteen-year-old boy who has been placed into foster care by

20  CCDFS since July 2003. (*Id.* ¶ 28).  Mason has been deaf since birth and entered foster care at

21  age six after suffering physical, sexual, and emotional abuse by his parents and grandparents.

22  (*Id.*).  He suffers from post-traumatic stress disorder, reactive attachment disorder, and other

23  serious mental health problems. (*Id.*).  During his first six years in foster care, he was placed into

24  —————————————

25      [1]Plaintiff does not allege actual abuse by this person against Christine herself or any other person, but notes only that CCDFS was aware of prior allegations of abuse.

1  twenty-five different homes, including a treatment center in Florida, the National Deaf Academy

2  ("NDA"). (*Id.*).  The NDA staff rendered Mason's cochlear implant permanently inoperative

3  against his wishes. (*Id.*).  Defendants ignored Mason's complaints of sexual abuse by NDA staff.

4  (*Id.*).  Defendants have failed to place Mason into homes where his special needs will be met,

5  i.e., with a qualified American Sign Language interpreter and have failed to provide speech

6  therapy. (*Id.*).  Defendants have failed to disclose Mason's medical, mental, social, and

7  educational backgrounds to his foster parents and have failed to properly supervise the

8  administration of Mason's psychotropic drugs. (*Id.*).

9         The current State Defendants are Michael Willden, Director of the Nevada Department of

10  Health and Human Services ("NDHHS"), sued in his official capacity, (*id.* ¶ 30); and Amber

11  Howell, the Administrator of NDCFS, sued in her official capacity, (*id.* ¶ 31).  The current

12  County Defendants are Clark County, Nevada, (*id.* ¶ 33); Virginia Valentine, the Clark County

13  Manager from August 2006 to January 2011, sued in her individual capacity, (*id.* ¶ 34); Don

14  Burnette, the current Clark County Manager, sued in his official capacity, (*id.* ¶ 35); Tom

15  Morton, the Director of CCDFS from July 2006 to August 2011, sued in his individual capacity,

16  (*id.* ¶ 36); and Lisa Ruiz-Lee, the current Director of CCDFS, sued in her official capacity, (*id.*

17  ¶ 37).  The current "Doe Defendants"[2] are ten current or former caseworkers, licensing

18  investigators, and other employees of CCDFS: Stacey Scott, Thor Martinez, Debbie Mallwitz,

19  Sonya Weathers, Darrel Ford, Yvette Chevalier, Teresa Cragon, Philomena Osemwengie, Sylvia

20  Clark, and Patricia Martin. (*Id.* ¶¶ 38–54).

21         Plaintiffs filed the seventy-five-page Complaint in this Court on April 13, 2010, listing

22  the following twelve nominal claims: (1)–(2), (11) substantive due process violations pursuant to

23

24         [2]It is not clear why these Defendants are listed as "Doe Defendants."  Their identities are
clearly alleged.  Plaintiffs also allege the existence of additional "Doe Defendants," (*see id.* ¶ 56),
25  but that pleading practice has no effect in federal court.

1   42 U.S.C. § 1983; (3), (8) violations of the Adoption Assistance and Child Welfare Act

2   ("AACWA") pursuant to § 1983; (4), (12) substantive due process violations under the Nevada

3   Constitution; (5) negligence; (6) declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201,

4   2202 that Nevada Revised Statute ("NRS") section 424.090 violates the Supremacy Clause; (7)

5   declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202 that NRS section 432.0177

6   violates the Supremacy Clause; and (9)–(10) violations of the Child Abuse Prevention and

7   Treatment Act ("CAPTA") pursuant to § 1983.  The case was assigned to the Hon. Howard D.

8   McKibben but was reassigned to this Court after Judge McKibben recused himself.

9          Defendants moved to dismiss.  Plaintiffs voluntarily dismissed the sixth and seventh

10  nominal claims (the Supremacy Clause claims).  In a thirty-one-page order, the Court granted the

11  motions to dismiss. (*See* Order, Oct. 26, 2010, ECF No. 85).  The Court ruled: (1) Defendants in

12  their official capacities were not entitled to Eleventh Amendment protection from claims for

13  prospective injunctive relief; (2) Defendants were not entitled to absolute immunity; (3)

14  Defendants were entitled to qualified immunity from the "duty to protect" substantive due

15  process claim; (4) Defendants were entitled to qualified immunity from the "state created

16  danger" substantive due process claim, and that claim was also dismissed for failure to state a

17  claim; (5) sections 671(a)(10), (16) and 675(1), (5)(A)(ii), (5)(D) of the AACWA created no

18  private right of action, and Defendants would be entitled to qualified immunity against these

19  claims in any case; (6) Defendants were entitled to qualified immunity from the "guardian ad

20  litem" CAPTA claim, and the Court would abstain from ruling on that claim under *Younger v.*

21  *Harris*, 401 U.S. 37 (1971) due to pending state proceedings; (7) there was no private right of

22  action for a "plan submission" claim under CAPTA; and (8) the Court would decline to rule on

23  the negligence claim under 28 U.S.C. § 1367(c).

24         Plaintiffs appealed.  In a thirty-four-page opinion, the Court of Appeals affirmed in part,

25  reversed in part, and remanded.  The Court affirmed the dismissal of all claims except the first,

1  second, third, eighth, and eleventh, which claims it remanded for further proceedings, and ruled

2  that Plaintiffs should be permitted to amend the substantive due process claims after remand and

3  should be able to seek leave to amend the tenth claim.  The Court of Appeals ruled that qualified

4  immunity applied only to Defendants in their individual capacities and only as to monetary

5  damages.  It reversed the qualified immunity rulings as to injunctive relief and as to monetary

6  damages against Clark County as to the first and eleventh causes of action and remanded for

7  further analysis of qualified immunity as to the claims for monetary damages against Defendants

8  in their individual capacities.  As to the second cause of action, the Court of Appeals ruled that

9  the "state created danger" doctrine applied not only when the state actually created the danger,

10  but also when the state knowingly exposed a person to an existing danger from a third person.

11  The Court of Appeals therefore reversed dismissal of the second claim and this Court's grant of

12  qualified immunity.  The Court of Appeals ruled that Plaintiffs had not sufficiently pled

13  supervisory responsibility claims against State Defendants but should be given leave to amend

14  the substantive due process claims to do so.  The Court of Appeals ruled that the "case plan"

15  provisions of AACWA under 42 U.S.C. §§ 671(a)(16) and 675(1) and the "records provision"

16  provisions of AACWA under §§ 671(a)(16), 675(1), and 675(5)(d) were privately enforceable.

17  The Court of Appeals affirmed that the "guardian ad litem" and "early intervention" provisions

18  of CAPTA, as well as the Individuals with Disabilities Education Act provision Plaintiffs

19  invoked, were not privately enforceable.

20      Plaintiffs filed the Amended Complaint ("AC"), listing six nominal claims: (1)–(2)

21  substantive due process violations pursuant to § 1983; (3), (6) AACWA violations pursuant to

22  § 1983; (4) substantive due process violations under the Nevada Constitution; and (5) negligence.

23  State Defendants and County Defendants separately moved to dismiss the AC.  The Court

24  granted the motions in part and denied them in part:

25          (1) The substantive due process claims, both federal and state, are dismissed

as against Defendants Willden and Comeaux insofar as they seek damages against them in their individual capacities.  Under the law of the case, however, no Defendants have qualified immunity at the dismissal stage.  The claims for injunctive relief are moot except as to failure to provide health information to foster parents (Henry A.), failure to investigate reports of abuse (Mason I.), and failure to inspect out-of-state facilities (Mason I.).

(2)  The Eleventh Amendment protects State Defendants in their official capacities from money damages as to any claim.

(3)  The AACWA "records provision" claim is dismissed as to money damages against Willden and Comeaux in their individual capacities, and the claim for injunctive relief is moot, except as to Plaintiffs Henry A. and Mason I.  The AACWA "case plan" claim is dismissed as to all Defendants, with leave to amend.

(4)  The negligence claim is dismissed under the discretionary immunity statute, except as to Christine F.'s and Mason I.'s claims invoking a negligence per se theory under NRS section 432B.260 and Olivia G.'s, Christine F.'s, and Mason I.'s claims invoking a negligence per se theory under NRS section 424.038.  Plaintiffs may amend their negligence claim to plead negligence per se theories based upon violations of state statutes, but not based upon violations of federal law or state administrative regulations.

(Order 28:7–24, Feb. 27, 2013, ECF No. 141).

Plaintiffs moved for leave to file the Second Amended Complaint ("SAC"), which motion the Court granted in part.  County Defendants asked the Court to reconsider its previous order in part.  The Court granted that motion in part, granting qualified immunity to individual Defendants as to monetary damages under the AACWA, but not as to the substantive due process claims.  The Court dismissed the "no-case-plan" claim as against County Defendants, with leave to amend.  The Court also clarified that:

The negligence claim remains viable against County Defendants insofar as it is predicated upon a negligence per se theory for violations of NRS sections 432B.260 (Christine F. and Mason I.) and 424.038 (Olivia G., Christine F., and Mason I.), and Plaintiffs have leave to amend as to NRS sections 432.0177 and 127.330, and as to other Plaintiffs' claims.

Plaintiffs filed the SAC.  The 101-page SAC lists five causes of action: (1) Substantive Due Process (Duty to Protect) violations pursuant to 42 U.S.C. § 1983 (against all Defendants except Ford, Chevalier, and Osemwengie); (2) Substantive Due Process (State Created Danger)

1  violations pursuant to § 1983 (against all Defendants except Osemwengie); (3) AACWA

2  violations (health care records) pursuant to § 1983 (against Clark County, Willden, Howell,

3  Burnette, and Ruiz-Lee); (4) Negligence (against Clark County, Morton, Valentine, Clark,

4  Chevalier, Ford, Mallwitz, Martin, Martinez, Osemwengie, Scott, and Weathers); and (5)

5  AACWA violations (written case plan) pursuant to § 1983 (against Clark County, Willden,

6  Howell, Burnette, and Ruiz-Lee).  County Defendants moved to dismiss the fifth cause of action

7  or for a more definite statement, and State Defendants joined the motion.  The Court did not

8  dismiss but required Plaintiffs to file a more definite statement via amendment or separate

9  affidavit as to the nature of Mason I.'s case plan deficiencies under 45 C.F.R. § 1356.21(g).

10     In the present round of motions, Osemwengie has moved for defensive summary

11  judgment as against the only claim against her (negligence), NDA has moved to dismiss

12  Defendant Chevalier's First Amended Third Party Complaint (FA3PC), and County Defendants

13  have moved to disqualify three of Plaintiff's counsel.

14  **II.     DISCUSSION**

15     **A.     Motion to Dismiss the First Amended Third-Party Complaint**

16     **1.     Legal Standards**

17     **a.     Personal Jurisdiction**

18     A defendant may move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P.

19  12(b)(2).  Personal jurisdiction exists if: (1) provided for by law; and (2) the exercise of

20  jurisdiction comports with due process. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204,

21  1207 (9th Cir. 1980).  When no federal statute governs personal jurisdiction, a federal court

22  applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir.

23  2008).  Where a forum state's long-arm statute provides for personal jurisdiction to the fullest

24  extent of the Due Process Clause of the Fourteenth Amendment, such as Nevada's does, *see*

25  *Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Court*, 134 P.3d 710, 712 (Nev. 2006) (citing Nev.

1   Rev. Stat. § 14.065), a court need only apply federal due process standards, *see Boschetto*, 539

2   F.3d at 1015.

3   　　　　There are two categories of personal jurisdiction: general jurisdiction and specific

4   jurisdiction.  General jurisdiction exists over a defendant who has "substantial" or "continuous

5   and systematic" contacts with the forum state such that the assertion of personal jurisdiction over

6   him is constitutionally fair even where the claims are unrelated to those contacts. *See Tuazon v.*

7   *R..J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citing *Helicopteros*

8   *Nacionales de Colombia, S.A. v. Hall*, 466 U .S. 408, 415 (1984)).  The Supreme Court recently

9   twice clarified that the reach of general jurisdiction is narrower than had been supposed in the

10  lower courts for many years. *See Daimler AG v. Bauman*, 134 S. Ct. 746, at 755 (2014) (citing

11  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2836, 2851 (2011)) (noting that

12  general jurisdiction lies not simply where a defendant has continuous and systematic contacts

13  with the forum state, but where those contacts are so pervasive as to render the defendant

14  "essentially at home" in the forum State).

15  　　　　Even where there is no general jurisdiction over a defendant, specific jurisdiction exists

16  when there are sufficient minimal contacts with the forum state such that the assertion of

17  personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

18  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316

19  (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The standard has been restated

20  using different verbiage. *See Hanson v. Denckla*, 357 U .S. 235, 253 (1958) ("[I]t is essential in

21  each case that there be some act by which the defendant purposefully avails itself of the privilege

22  of conducting activities within the forum State, thus invoking the benefits and protections of its

23  laws." (citing *Int'l Shoe Co.*, 326 U.S. at 319)); *World-wide Volkswagen Corp. v. Woodson*, 444

24  U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere

25  likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's

conduct and connection with the forum State are such that he should reasonably anticipate being

haled into court there." (citing *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97–98 (1978))).

From these cases and others, the Ninth Circuit has developed a three-part test for specific

jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797,

802 (9th Cir. 2004)).

> The plaintiff bears the burden on the first two prongs. If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable. But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.

*Id.* (citations omitted). The "purposeful direction" option of the first prong uses the "*Calder*-

effects" test, under which "the defendant allegedly must have (1) committed an intentional act,

(2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128

(9th Cir. 2010) (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433

F.3d 1199, 1206 (9th Cir. 2006) (en banc)). The third prong of the specific jurisdiction test is

itself a seven-factor balancing test, under which a court considers:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

1  *Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) (quoting *CE Distrib., LLC v. New Sensor*

2  *Corp.*, 380 F.3d 107, 1112 (9th Cir. 2004)).

3        **b.**    **Failure to State a Claim**

4        Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

5  claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

6  what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47

7  (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

8  that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule

9  12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720

10 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for

11 failure to state a claim, dismissal is appropriate only when the complaint does not give the

12 defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell*

13 *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is

14 sufficient to state a claim, the court will take all material allegations as true and construe them in

15 the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

16 Cir. 1986).  The court, however, is not required to accept as true allegations that are merely

17 conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

18 *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action

19 with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own

20 case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79

21 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff

22 pleads factual content that allows the court to draw the reasonable inference that the defendant is

23 liable for the misconduct alleged.").  In other words, under the modern interpretation of Rule

24 8(a), a plaintiff must not only specify or imply a cognizable legal theory (*Conley* review), but

25 also must plead the facts of his own case so that the court can determine whether the plaintiff has

1  any plausible basis for relief under the legal theory he has specified or implied, assuming the

2  facts are as he alleges (*Twombly-Iqbal* review).

3      "Generally, a district court may not consider any material beyond the pleadings in ruling

4  on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the

5  complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner*

6  *& Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents

7  whose contents are alleged in a complaint and whose authenticity no party questions, but which

8  are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6)

9  motion to dismiss" without converting the motion to dismiss into a motion for summary

10 judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule

11 of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay*

12 *Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court

13 considers materials outside of the pleadings, the motion to dismiss is converted into a motion for

14 summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir.

15 2001).

16      **2.    Analysis**

17      Chevalier is a former employee of CCDFS. (*See* First Am. Third-Party Compl. ¶ 1, Nov.

18 21, 2013, ECF No. 267).  She is implicated under the second and fourth claims of the SAC for

19 substantive due process (state created danger) and negligence.  She has sued NDA, Deborah Hill,

20 and Joseph Hill for equitable indemnity and contribution, and she has sued Deborah and Joseph

21 Hill for express indemnity.  NDA has moved to dismiss or to stay, and for a change of venue.

22      Deborah Hill is a former foster parent of Plaintiffs Charles and Charlotte B., and Joseph

23 Hill is Deborah Hill's son. (*Id.* ¶¶ 2, 4).  Although Deborah and Joseph Hill resided in Nevada

24 during the times relevant to the Complaint, they now reside in New York. (*Id.* ¶¶ 3, 5).  NDA is a

25 Florida limited liability company that accepts patients from every state, including Nevada. (*Id.*

1    ¶ 7).  In the SAC, Plaintiffs allege that Chevalier was responsible for oversight of the licensing

2    investigation of Charles and Charlotte B.'s foster parent, who abused them. (*Id.* ¶ 10).  That

3    foster parent was Deborah Hill, and she eventually pled guilty to two counts of child neglect.

4    (*Id.* ¶ 12).  Joseph Hill was also criminally prosecuted for abusing Charles and Charlotte B., but

5    the outcome of that prosecution is not alleged. (*See id.* ¶ 13).  "Additionally, allegations made in

6    these proceedings relate to Mason I's placement at NDA, and the licensing inspection thereof."

7    (*Id.* ¶ 14).  NDA notes that Mason I. alleges he was sexually abused by another resident at NDA

8    and that the external component of his cochlear implant was improperly removed by NDA staff.

9         NDA first argues there is no personal jurisdiction over it in Nevada.  In some cases, a

10   tortious act occurring outside the disputed forum may still give rise to specific personal

11   jurisdiction in that forum if the foreign act is purposely directed to the forum state. *Dole Food*

12   *Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. 783,

13   78–89 (1984)).  In *Calder*, the Supreme Court held that a defamatory article about a California

14   resident published in Florida satisfied the Due Process Clause as to purposeful direction to

15   California on the ground that the tortious conduct was "expressly aimed" at the forum state in

16   which harm occurred (California). *Id.*  That is, the defendants in *Calder* "knew that the brunt of

17   that injury would be felt by [the plaintiff] in the State in which she lives and works and in which

18   the [publication] has its largest circulation.  Under the circumstances, petitioners must

19   'reasonably anticipate being haled into court there' to answer for the truth of the statements made

20   in their article." *Calder*, 465 U.S. at 789–90 (quoting *World-wide Volkswagen Corp.*, 444 U.S. at

21   297).

22        Here, NDA accepted Mason I., a patient from Nevada, for treatment.  It therefore knew

23   that any harm arising out of that care would manifest itself in (or continue to be felt in) Nevada

24   once he returned.  Still, the Court of Appeals has ruled that the *Calder* effects test applies only to

25   intentional torts, not to negligence claims. *See Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,

485 F.3d 450, 460 (9th Cir. 2007) (citing *Calder*, 465 U.S. at 789). Because NDA's wrongdoing is alleged only to be negligence, the *Calder* effects test cannot support personal jurisdiction over NDA in Nevada in this case. NDA is not implicated in any intentional wrongdoing. The allegations in the SAC indicate only that Mason I. was sexually abused (by an unidentified person) while at NDA, and that his cochlear implant was removed. It does not plausibly allege that an employee of NDA was the abuser or that NDA's removal of the implant amounted to a battery. It is consistent with the SAC that a non-employee of NDA, i.e., another resident, was the abuser and that the implant was removed according to routine procedure without any objection by Mason I. The SAC might be found to plausibly allege negligence against NDA (if NDA were a Defendant), but the allegations are not enough for the State of Nevada to exercise personal jurisdiction over NDA. The acts did not occur in Nevada, and they were not directed to Nevada under *Calder* and *Holland* because no intentional torts by NDA are plausibly alleged.

The Court will therefore dismiss the FA3PC as against NDA. The Court will not transfer in the interests of justice, because venue lies in Nevada as to the SAC and the remainder of the FA3PC itself. Chevalier may bring her indemnity and contribution claims against NDA in the Florida courts, if she can.

### B.   Motion for Summary Judgment

#### 1.   Legal Standards

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported

1    claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

2    judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at
> trial, it must come forward with evidence which would entitle it to a directed verdict
> if the evidence went uncontroverted at trial.  In such a case, the moving party has the
> initial burden of establishing the absence of a genuine issue of fact on each issue
> material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

demonstrating that the nonmoving party failed to make a showing sufficient to establish an

element essential to that party's case on which that party will bear the burden of proof at trial. *See*

*Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary

judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to

establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d

1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and

allegations of the pleadings and set forth specific facts by producing competent evidence that

shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

1    At the summary judgment stage, a court's function is not to weigh the evidence and

2  determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

3  U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

4  to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely

5  colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

6    **2.    Analysis**

7    Osemwengie moves for defensive summary judgment.  The Court will reserve its

8  decision until after the May 15, 2014 hearing but will note its inclinations at this time for the

9  benefit of the parties.

10    Osemwengie is charged only with negligence.  She was a Senior Family Services

11  Specialist with CCDFS and was responsible for investigating reports concerning possible abuse

12  of Victor and Leo C. in June and July 2005. (*See* Second Am. Compl. ¶ 50).  In July 2005, Victor

13  and Leo's mother telephoned Osemwengie and reported suspected sexual abuse, sending a

14  pornographic magazine she claimed they had been reading and "some supporting emails." (*Id.*

15  ¶ 242).  Osemwengie allegedly made no efforts to investigate. (*See id.*).  These are the entirety of

16  the allegations in the SAC as to Osemwengie.  Osemwengie argues that there is no evidence of

17  any causal link between her acts or omissions and any abuse suffered by Plaintiffs, and that she is

18  protected by the discretionary immunity statute in any case.

19    Osemwengie notes that the children at issue were in the custody of their father after a

20  divorce, and that their mother discovered a *Playboy* magazine on one of their backpacks during a

21  weekend visit at the time when the twin boys were approximately 12 1/2 years old.  The boys

22  admitted to having taken some pornographic media out of their father's room without their

23  father's knowledge in the past, including the *Playboy* magazine.  At the time, the parents were in

24  the midst of tit-for-tat reports of child abuse.  First, the father reported that the boys' stepfather,

25  who lived with their mother, had grabbed Leo C. by the shirt, choked him, and restrained him by

1   the upper arm.  Osemwengie responded to the father's house and checked the boys for bruises,

2   finding none.  Osemwnegie interviewed the mother on June 30, 2005, who denied the charges

3   and accused the boys of having attacked her and their stepfather.  The boys at that time indicated

4   they did not wish to visit their mother anymore.  The stepfather denied the charges during a

5   telephone interview on that day and said the boys liked to watch pornographic movies and were

6   out of control.  Osemwengie then spoke to the mother about the pornography issue, which is

7   when the mother mailed Osemwengie the *Playboy* magazine.  Osemwengie had visited the boys

8   two days earlier at their father's residence and did not believe they appeared to be "out of

9   control" or that they acted in any way indicative of any sexual abuse.  (It appears that the sexual

10  abuse alleged at that time was limited to the boys' access to pornographic materials.)  The father

11  denied exposing the boys to pornography and believed the mother was simply making allegations

12  in retaliation for the allegations he had made, a pattern that Osemwengie noted is extremely

13  common in contentious divorces, in her experience.  Osemwengie disbelieved the father and

14  stepmother and did not find anything to substantiate any sexual abuse.

15          Plaintiffs respond that the next time an investigator went to the home, one-and-a-half

16  years later, she discovered the father's pornography and elicited a confession of actual sexual

17  abuse by him, which ultimately led to his conviction of three felony counts, for which he was

18  sentenced to 28 years to life in prison.  Plaintiffs allege that the magazine the mother had found

19  was not *Playboy* but was "more sexually graphic," and that the emails at issue were pornographic

20  in nature and had been sent to the boys by their father.  They note that Osemwengie concedes

21  receiving the materials and putting them into a file without looking at them.

22          In Nevada, certain government actors have discretionary immunity from common law

23  claims.  *See* Nev. Rev. Stat. § 41.032.  This section of the code immediately follows the section

24  that waives the state's common law sovereign immunity but retains the state's Eleventh

25  Amendment protection.  *See id.* § 41.031.  The discretionary immunity statute applies to actions

1   brought "against an immune contractor or an officer or employee of the State or any of its

2   agencies or political subdivisions." *See id.* § 41.032.  On its face, the statute does not necessarily

3   immunize municipal governments or their employees, because in some contexts municipalities

4   are considered independent corporations or "persons" with their own identities, not mere political

5   subdivisions of the state, at least in the eyes of Congress. *See Monell v. Dep't of Social Servs. of*

6   *City of N.Y.*, 436 U.S. 658, 690 (1978).  The Nevada Supreme Court, however, has always

7   assumed that municipalities are political subdivisions of the state for the purposes of the

8   discretionary immunity statute. *See, e.g.*, *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353,

9   1354–55 (Nev. 1987).  This construction is consistent with *Monell*, because the discretionary

10  immunity statute only protects state and municipal agencies against state causes of action, such

11  as the present negligence claim.

12          The question remains whether there is discretionary immunity as a matter of law in this

13  case.  The statute immunizes municipal agencies and their employees against actions:

14          [b]ased upon the exercise or performance or the failure to exercise or perform a
            discretionary function or duty on the part of the State or any of its agencies or
15          political subdivisions or of any officer, employee or immune contractor of any of
            these, whether or not the discretion involved is abused.

16
17  Nev. Rev. Stat. § 41.032(2).  In interpreting this statute, the Nevada Supreme Court has explicitly

18  adopted the two-part test for discretionary immunity under the Federal Tort Claims Act, under

    which there is discretionary immunity when: (1) the allegedly negligent acts involve elements of
19
    judgment or choice; (2) and the judgment or choice made involves social, economic, or political
20
    policy considerations. *Martinez v. Maruszczak*, 168 P.3d 720, 722 (Nev.2007) (citing *Berkovitz v.*
21
    *United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991)).  Under this
22
    standard, a court does not ask whether the official abused his or her discretion, *see* Nev. Rev.
23
    Stat. § 41.032(2), but only whether the acts concerned a matter in which the official had
24
    discretion.  In other words, the immunity is not infinitely broad, but once it is determined that the
25

1  acts at issue were within the breadth of the statute, i.e., that they involved judgment or choice on

2  social, economic, or political policy considerations, the immunity then applies even to abuses of

3  discretion.  Still, there is no discretionary immunity for acts taken in "bad faith," which is a

4  subjective failure that is worse than an objective abuse of discretion.  *See Falline v. GNLV Corp.*,

5  823 P.2d 888 (1991); *accord Wright v. Wynn*, 682 So.2d 1, 2 (Ala. 1996) (equating "bad faith" in

6  this context with "malice or willfulness").  The *Falline* Court held that "bad faith" encompasses

7  acts that are completely outside the authority of an official: "Bad faith ... involves an

8  implemented attitude that completely transcends the circumference of authority granted the

9  individual or entity.  In other words, an abuse of discretion occurs within the circumference of

10 authority, and an act or omission of bad faith occurs outside the circumference of authority." *Id.*

11 at 892 n. 3.  In *Davis v. City of Las Vegas*, the Ninth Circuit noted that under *Falline*, "where an

12 officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as

13 to the force required to make an arrest [an objective abuse of discretion], but instead because of

14 hostility toward a suspect or a particular class of suspects (such as members of racial minority

15 groups) or because of a willful or deliberate disregard for the rights of a particular citizen or

16 citizens [a subjective abuse of power], the officer's actions are the result of bad faith and he is

17 not immune from suit." 478 F .3d 1048, 1060 (9th Cir. 2007).  The difference between a

18 non-actionable abuse of discretion and an actionable bad-faith violation of rights therefore

19 appears to turn on the state actor's mental state; when he crosses the line from recklessness as to

20 a person's rights to malicious intent to violate them, he is no longer protected by the

21 discretionary immunity statute, even if he initially satisfies the two-part test under *Martinez*.

22          In this case, the first prong of discretionary immunity appears to be satisfied, because

23 decisions concerning removal from a home based upon allegations between divorced parents

24 clearly involves personal deliberation and judgment.  This prong of the test is usually easy to

25

1   satisfy—a task must simply involve some element of personal deliberation and choice so as not

2   to be purely ministerial.

3          The second prong of the test is trickier to apply. It focuses on the purposes of

4   discretionary immunity:

5          Because the FTCA's discretionary-function exception is not a bright-line rule, federal
           courts applying the *Berkovitz–Gaubert* test must assess cases on their facts, keeping
6          in mind Congress' purpose in enacting the exception: "to prevent judicial
           'second-guessing' of legislative and administrative decisions grounded in social,
7          economic, and political policy through the medium of an action in tort." Thus, if the
           injury-producing conduct is an integral part of governmental policy-making or
8          planning, if the imposition of liability might jeopardize the quality of the
           governmental process, or if the legislative or executive branch's power or
9          responsibility would be usurped, immunity will likely attach under the second
           criterion.

10

11                 . . . .

12         We therefore adopt the *Berkovitz–Gaubert* approach and clarify that to fall within the
           scope of discretionary-act immunity, a decision must (1) involve an element of
13         individual judgment or choice and (2) be based on considerations of social,
           economic, or political policy. In this, we clarify that decisions at all levels of
14         government, including frequent or routine decisions, may be protected by
           discretionary-act immunity, if the decisions require analysis of government policy
15         concerns. However, discretionary decisions that fail to meet the second criterion of
           this test remain unprotected by NRS 41.032(2)'s discretionary-act immunity.

16         Under the *Berkovitz–Gaubert* test, the decision to create and operate a public hospital
           and the college of medicine are the type of decisions entitled to
17         discretionary-function immunity, because those decisions satisfy both prongs of the
           *Berkovitz–Gaubert* test; namely, they involve elements of judgment and choice, and
18         they relate to social and economic policy. But, while a physician's diagnostic and
           treatment decisions involve judgment and choice, thus satisfying the test's first
19         criterion, those decisions generally do not include policy considerations, as required
           by the test's second criterion. In this case, as Dr. Martinez did not engage in
20         policy-making decisions in his treatment of Mr. Maruszczak, he is not entitled to
           immunity from suit under NRS 41.032(2).

21
   *Martinez*, 168 P.3d at 729 (footnotes omitted). The *Martinez* Court rejected the previously used
22
   discretionary—ministerial test, under which liability could only attach where a government actor
23
   was bound to act in a narrowly particular way and strayed from that direction. *See id.* at 727 n.27
24
   (citing *Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d 932, 934 (Nev. 1994)). *Martinez*
25

1 | clarified that officials could be liable even where they exercised judgment if that judgment was

2 | not akin to social, economic, or political policy-making, but the case still did not distinguish

3 | between (1) exercising judgment in a way totally divorced from any existing policies and (2)

4 | exercising judgment in a way motivated by existing policies.

5 |       The Nevada Supreme Court has applied *Martinez* several times, and it answered the

6 | question posed above in the latest such case.  In *Butler ex rel. Butler v. Bayer*, the Court ruled

7 | that defendants were not entitled to discretionary immunity as against a negligence claim for

8 | releasing a quadriplegic inmate outside his girlfriend's trailer when she was not home and when

9 | the trailer had not been prepared to receive him as planned. 168 P.3d 1055, 1059–60, 1067 (Nev.

10 | 2007).  Although the act involved personal judgment, it did not involve policy-making

11 | considerations.  Later, in *City of Boulder City v. Boulder Excavating, Inc.*, the Court ruled that a

12 | city engineer who requested that a contractor replace one of its subcontractors had discretionary

13 | immunity against the subcontractor's claims for defamation and intentional interference with

14 | contractual relationship, because the city engineer was executing city policy that was based upon

15 | public policy considerations—the city had experienced problems in dealing with the plaintiff

16 | company in the past. 191 P.3d 1175, 1177, 1180–81 (Nev. 2008).  The *Boulder Excavating* Court

17 | thus took the first step in answering the question posed, *supra*.  Most recently, in *Ransdell v.*

18 | *Clark County*, the Court answered the question clearly when it ruled that where there is no

19 | particular policy or statute in place making the act at issue a purely ministerial one, but where the

20 | actor's personal decision is made in furtherance of stated goals and policies, the statute protects

21 | the actor. 192 P.3d 756, 763 (Nev. 2009).  In *Ransdell*, a county inspector obtained a warrant to

22 | have debris involuntarily removed from Mr. Ransdell's property when he refused to remove it

23 | himself after several complaints, inspections, citations, and extensions of time. *See id.* at 759.

24 | The County removed the debris, and Mr. Ransdell brought § 1983 and state law tort claims

25 | against the County. *Id.* at 759–60.  Applying *Martinez* and examining a factually similar case

1   from Iowa (which, like Nevada, had adopted the *Berkovitz–Gaubert* test), the Court ruled that the

2   second prong of the test was satisfied "because the goals of the County in abating Ransdell's

3   property were motivated by environmental, health, and economic policies supported by Clark

4   County Code and statutory authority." *Id.* at 763.

5        *Ransdell* does much to clarify the scope of an every-day actor's immunity.  After

6   *Martinez* but before *Ransdell*, it appeared that every-day actors such as county inspectors and

7   police officers would not be immune under the statute unless their actions were ministerial tasks

8   particularly commanded by ordinances or official policies.  Acts involving every-day

9   implementation of policy choices, but which did not themselves consist of policy choices, did not

10  appear to be protected.  *Ransdell* makes it clear that individual acts involving the implementation

11  of covered types of policy choices are protected under the discretionary immunity statute. *Id.* at

12  764 ("[B]ecause the County's actions were grounded on public policy concerns, as expressed in

13  the County Code and Nevada's abatement statute, they fit within the second criterion of the

14  *Berkovitz–Gaubert* test.").

15       Here, as a general matter, a decision not to remove a child from the custody of a parent

16  involves elements of judgment and choice, and Osemwengie's choice not to remove the children

17  from the custody of their parents was grounded on public policy concerns as expressed in the

18  Nevada Revised Statutes.  Plaintiffs have not alleged malice, but rather only negligence, however

19  gross.  As terrible as the situation is, and as negligent as Osemwengie might have been (assuming

20  Plaintiffs' evidence is true), the discretionary immunity statute might still protect Osemwengie

21  from civil liability.

22       On the other hand, Plaintiffs are correct that Osemwengie had a statutory duty to

23  investigate reports of child abuse or neglect. *See* Nev. Rev. Stat. §§ 432B.260, 432B.300.

24  Plaintiffs note that Osemwengie did not investigate after receiving the emails from the father to

25  the boys and the pornographic magazine.  That is, after she received the evidence, she closed the

1    case and chose not to further investigate, without even looking at the additional evidence, based

2    upon her previous visit to the father's home and observation of the boys there.  The Court accepts

3    Plaintiffs' argument that failing to take any further action to investigate after receiving the

4    previously unexamined evidence could constitute a failure to investigate under the statute, which

5    is a mandated task, the failure of which would prevent Osemwengie from asserting the qualified

6    immunity defense.  The Court therefore intends to leave it to the jury whether Osemwengie

7    satisfied her statutory duty to investigate in this case.  A reasonable jury could decide the issue

8    either way based upon the evidence currently adduced.

9    **C.    Motion to Disqualify Counsel**

10          County Defendants ask the Court to disqualify three of Plaintiffs' attorneys from the

11   National Center for Youth Law ("NCYL").  Defendants report that in November 2013, an

12   attorney for NCYL not associated with the present case, Kate Walker, approached Faiza

13   Ebrahim, a managerial and supervisory employee of CCDFS, and, without identifying herself or

14   her organization's involvement in the case, and knowing that Ebrahim was an employee of

15   represented party CCDFS, solicited information relevant to the present case.  Plaintiffs argue that

16   this violated Nevada Rules of Professional Conduct 4.2 and/or 4.3:

17          Rule 4.2.   In representing a client, a lawyer shall not communicate about the
         subject of the representation with a person the lawyer knows to be represented by
18       another lawyer in the matter, unless the lawyer has the consent of the other lawyer or
         is authorized to do so by law or a court order.
19
20          Rule 4.3.   Dealing With Unrepresented Person.   In dealing on behalf of a
         client with a person who is not represented by counsel, a lawyer shall not state or
         imply that the lawyer is disinterested.  When the lawyer knows or reasonably should
21       know that the unrepresented person misunderstands the lawyer's role in the matter,
         the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer
22       shall not give legal advice to an unrepresented person, other than the advice to secure
         counsel, if the lawyer knows or reasonably should know that the interests of such a
23       person are or have a reasonable possibility of being in conflict with the interests of
         the client.
24

25

1   Nev. R. Prof. Conduct 4.2, 4.3.  Plaintiffs support the allegations with the affidavit and

2   deposition transcript of Ms. Ebrahim.  Defendants allege that Walker was aware of Ms.

3   Ebrahim's employment by CCDFS when she approached her and purposely did not identify

4   herself or her organization's involvement in the case until after soliciting the relevant

5   information.  Defendants allege that the information solicited was then used by other NCYL

6   attorneys to question Ebrahim at her deposition two months later.  Defendants note that NCYL's

7   attorney's are bound by Nevada's ethics rules under Local Rule IA 10-7(a).

8          Plaintiffs respond that Ebrahim is not an employee of CCDFS and that Ms. Walker has

9   done no work on the present case.  Defendants reply that the attorneys working on the case had a

10  duty to supervise Ms. Walker and to correct any violations that might have occurred.  Plaintiffs

11  also respond that Ms. Ebrahim is an employee not of CCDFS, but of the Southern Nevada

12  Children's Assessment Center ("SNCAC"), which is a "Clark County entity that is not a party to

13  this action."  Defendants' reply is not entirely clear, but they appear to argue that Ms. Ebrahim is

14  an employee of SNCAC, which is an arm of the County.

15         The Court finds that it must hold an evidentiary hearing.  If the allegations are true, an

16  appropriate sanction would be the exclusion of any fruits of the violation, plus the

17  disqualification of any NCYL attorney who directed the improper conduct or ratified it by using

18  the improper information at the deposition or by not reporting the violation to the Court.  In order

19  to sort out the relevant facts—whether a violation occurred, who knew about it, and when—the

20  Court will have to question Ms. Ebrahim, NCYL's two current attorneys, plus Ms. Walker at the

21  May 15, 2014 hearing in Las Vegas.  These persons (Faiza Ebrahim, Kate Walker, Erin Liotta,

22  and Leecia Welch) must therefore appear at the May 15, 2015 hearing.

23  ///

24  ///

25  ///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss or Stay and to Transfer Venue (ECF No. 280) is GRANTED IN PART, and the First Amended Third-Party Complaint (ECF No. 267) is DISMISSED as against National Deaf Academy, LLC.

IT IS FURTHER ORDERED that the Motion for Jurisdictional Discovery (ECF No. 394) is DENIED.

IT IS FURTHER ORDERED that Faiza Ebrahim, Kate Walker, Erin Liotta, and Leecia Welch must appear at the May 15, 2015 hearing prepared to testify as to the Motion to Disqualify Counsel (ECF No. 313).

IT IS SO ORDERED.

Dated this 7th day of May, 2014.

_____
ROBERT C. JONES
United States District Judge